# 23-6572-cr(L), 23-7255-cr(CON)

# United States Court of Appeals

*for the*

# Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

JAMES JEREMY BARBERA, AKA Sealed Defendant 1,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLANT

ALEXANDER H. SHAPIRO
STEPHEN R. HALPIN III
FORD O'BRIEN LANDY LLP
*Attorneys for Defendant-Appellant*
275 Madison Avenue, 24th Floor
New York, New York 10016
(212) 858-0040
ashapiro@fordobrien.com
shalpin@fordobrien.com

CP COUNSEL PRESS    (800) 4-APPEAL • (324913)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ........................................................ 1

QUESTIONS PRESENTED ................................................................ 2

STATEMENT OF THE CASE ............................................................. 4

    A.    Arrest and Trial of James Jeremy Barbera .......................... 4

    B.    The Government's Case at Trial ...................................... 4

    C.    The November 4, 2021 Suppression Hearing ..................... 9

    D.    The District Court's Rule 33 Decision ............................. 10

    E.    The May 4, 2023 Sentencing Hearing.............................. 11

    F.    The Board Minutes Introduced at Sentencing................... 14

    G.    The District Court's September 13, 2023 Restitution Order ............. 15

    H.    The District Court's Declination to Issue an Indicative Ruling.......... 16

SUMMARY OF ARGUMENT ........................................................... 16

ARGUMENT ................................................................................ 19

    I.    The Convictions Must be Reversed Under *Ciminelli* ......... 19

        A.    The *Ciminelli v. United States* Decision ................... 19

        B.    The Second Circuit's *Wallach* Decision ................... 20

        C.    The Wire Fraud Conviction was Based on a Right-to-Control Theory .......... 22

        D.    The Securities Fraud Conviction was Based on a Right-to-Control Theory ......... 27

    II.    The District Court's Calculation of Loss under the Sentencing Guidelines was Legally Incorrect......... 33

    III.    The District Court Erroneously Ordered Restitution ......... 44

    IV.    The Conscious Avoidance Charge was Improper .............. 49

i

V.     The Substance of the Conscious Avoidance Charge Was
       Legally Incorrect ............................................................................56

VI.    The Government Intentionally Withheld *Giglio* Material .................58

VII.   The District Court Abused its Discretion in Failing to Reopen
       the Suppression Hearing.................................................................62

VIII.  The Government Introduced Insufficient Evidence of a
       Conspiratorial Agreement ..............................................................67

CONCLUSION ..................................................................................................72

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Brady v. Maryland*,
373 U.S. 83 (1963)..................................................................58, 59

*Ciminelli v. United States*,
598 U.S. 306 (2023)..................................................*passim*

*Cleveland v. United States*,
531 U.S. 12 (2000)..................................................................28, 30

*Dura Pharmaceuticals, Inc. v. Broudo*,
544 U.S. 336 (2005)..................................................34, 35, 37, 45

*First Nationwide Bank*,
27 F.3d 763 (2d Cir. 1994) ........................................................37

*Giglio v. United States*,
405 U.S. 150 (1972)..................................................3, 18, 59, 61

*In re Chateaugay Corp.*,
89 F.3d 942 (2d Cir. 1996) ........................................................28

*Lentell v. Merrill Lynch*,
396 F.3d 161 (2d Cir. 2005) ....................................................*passim*

*McNally v. United States*,
483 U.S. 350 (1987)..................................................................28

*Santa Fe Industries, Inc. v. Green*,
430 U.S. 462 (1977)..................................................................29

*SEC v. Zandford*,
535 U.S. 813 (2002)..................................................................29

*Securities and Exchange Commission v. Govil*,
86 F.4th 89 (2d Cir. 2023) ....................................................*passim*

*Superintendent of Ins. of State of N.Y. v. Bankers Life & Cas. Co.*,
404 U.S. 6 (1971)..................................................................29

*U.S. v. Gushlak*,
728 F.3d 184 (2d Cir. 2013) ....................................17, 37, 45, 48

*U.S. v. Zangari*,
    677 F.3d 86 (2d Cir. 2012) ............................................................45

*United States v. Adeniji*,
    31 F.3d 58 (2d Cir. 1994) ..............................................................52

*United States v. Aina-Marshall*,
    336 F.3d 167 (2d Cir. 2003) ..........................................18, 49, 52

*United States v. Aleynikov*,
    676 F.3d 71 (2d Cir. 2012) ....................................................26, 31

*United States v. Anderson*,
    929 F.2d 96 (2d Cir. 1991) ...........................................19, 63, 64

*United States v. Archer*,
    671 F.3d 149 (2d Cir. 2011) ..........................................................45

*United States v. Balde*,
    943 F.3d 73 (2d Cir. 2019) ....................................................20, 56

*United States v. Balwani*,
    5:18-cr-258, 2023 WL 2065045 (N.D. Cal. Feb. 16, 2023)..........35

*United States v. Bayless*,
    201 F.3d 116 (2d Cir. 2000) ..........................................................62

*United States v. Beech-Nut Nutrition Corp.*,
    871 F.2d 1181 (2d Cir. 1989) ........................................................67

*United States v. Binday*,
    804 F.3d 558 (2d Cir. 2015) .................................................. 19-20

*United States v. Booker*,
    543 U.S. 220 (2005)........................................................................34

*United States v. Byors*,
    586 F.3d 222 (2d Cir. 2009) ..........................................................43

*United States v. Calderon*,
    944 F.3d 72 (2d Cir. 2019) ............................................................45

*United States v. Capers*,
    20 F.4th 105 (2d Cir. 2021) .......................................26, 27, 31, 33

*United States v. Chestman*,
    947 F.2d 551 (2d Cir. 1991) ....................................................28, 31

*United States v. Coppa*,
  267 F.3d 132 (2d Cir. 2001) .........................................................18, 58, 59, 62

*United States v. DeSimone*,
  119 F.3d 217 (2d Cir. 1997) .........................................................67

*United States v. Dorvee*,
  616 F.3d 174 (2d Cir. 2010) .........................................................33

*United States v. Ebbers*,
  458 F.3d 110 (2d Cir. 2006) .........................................................*passim*

*United States v. Ferrarini*,
  219 F.3d 145 (2d Cir. 2000) .........................................................18, 56

*United States v. Fofanah*,
  765 F.3d 141 (2d Cir. 2014) .........................................................52

*United States v. Gamez*,
  577 F.3d 394 (2d Cir. 2009) .........................................................34

*United States v. Garcia*,
  587 F.3d 509 (2d Cir. 2009) .........................................................26

*United States v. Garcia*,
  992 F.2d 409 (2d Cir. 1993) .........................................................31

*United States v. Goodrich*,
  12 F.4th 219 (2d Cir. 2021) .........................................................15, 47

*United States v. Hsu*,
  669 F.3d 121 (2d Cir. 2012) .........................................................12, 42, 43

*United States v. Huezo*,
  546 F.3d 174 (2d Cir. 2008) .........................................................18, 58

*United States v. Kaplan*,
  490 F.3d 110 (2d Cir. 2007) .........................................................18, 51, 56

*United States v. Leonard*,
  529 F.3d 83 (2d Cir. 2008) .........................................................38

*United States v. Marcus*,
  560 U.S. 258 (2010).........................................................27

*United States v. Marino*,
  654 F.3d 310 (2d Cir. 2011) .........................................................48

*United States v. Pearlstein,*
    576 F.2d 531 (3d Cir. 1978) ...................................................19, 69

*United States v. Preldakaj,*
    489 Fed. App'x 507 (2d Cir. 2012) ...............................................34

*United States v. Reifler,*
    446 F.3d 65 (2d Cir. 2006) .........................................................46

*United States v. Rios,*
    500 Fed. App'x 27 (2d Cir. 2012) ................................................63

*United States v. Rodriguez,*
    983 F.2d 455 (2d Cir. 1993) ...................................................51, 52

*United States v. Rosenblatt,*
    554 F.2d 36 (2d Cir. 1977) .........................................................67

*United States v. Rutkoske,*
    506 F.3d 170 (2d Cir. 2007) ...............................................*passim*

*United States v. Samaria,*
    239 F.3d 228 (2d Cir. 2001) .......................................18, 19, 58, 70

*United States v. Sangmin Chun,*
    399 Fed. App'x 669 (2d Cir. 2010) ...............................................67

*United States v. Santos,*
    553 U.S. 507 (2008).................................................................30

*United States v. Selioutsky,*
    409 F.3d 114 (2d Cir. 2005) ...................................................34, 44

*United States v. Skelly,*
    442 F.3d 94 (2d Cir. 2006) .........................................................32

*United States v. Stitsky,*
    536 Fed. App'x 98 (2d Cir. 2013) .............................................42, 43

*United States v. Taylor,*
    745 F.3d 15 (2d Cir. 2014) ...............................................*passim*

*United States v. Ustica,*
    847 F.2d 42 (2d Cir. 1988) .........................................................67

*United States v. Wallach,*
    935 F.2d 445 (2d Cir. 1991) ...............................................*passim*

**Statutes & Other Authorities:**

15 U.S.C. § 78ff ................................................................................. 4

15 U.S.C. § 78j(b) ............................................................................. 4

18 U.S.C. § 371 ............................................................................ 4, 67

18 U.S.C. § 1341 ............................................................................. 30

18 U.S.C. § 1343 ............................................................ 4, 19, 21, 27

18 U.S.C. § 3231 ............................................................................... 1

18 U.S.C. § 3663A ........................................................................... 17

18 U.S.C. § 3663A(a)(2) .................................................................. 45

28 U.S.C. § 1291 ............................................................................... 1

17 C.F.R. § 240.10b-5 ............................................................. *passim*

11 Fletcher § 5097 .......................................................................... 24

Fed. R. Cr. P. 33 ....................................................................... 10, 50

Fed. R. Cr. P. 37 ............................................................................. 16

Mandatory Victim Restitution Act,
    Pub. L. No. 104–132, 110 Stat. 1227 ................................ 2, 17, 45

U.S.S.C. § 2B1.1 ...................................................................... 13, 33

U.S.S.C. § 2B1.1(b)(1) .................................................................... 44

U.S.S.C. § 2B1.1(b)(2)(A)(i) ........................................................... 44

# JURISDICTIONAL STATEMENT

The District Court possessed subject-matter jurisdiction under 18 U.S.C. § 3231. On May 17, 2023, the Honorable John G. Koeltl, United States District Judge of the District Court for the Southern District of New York, entered judgment against James Jeremy Barbera, ordering a term of imprisonment of 48 months, supervised release of three years, and forfeiture in the amount of $7,026,150. SPA 25-31. On May 31, 2023, Mr. Barbera timely noticed an appeal from the Judgment. A1163.

Thereafter, on September 18, 2023, the District Court entered a separate order of restitution. SPA 43-44. On October 2, 2023, Mr. Barbera timely noticed an appeal from this decision. A1187.

On October 4, 2023, this Court consolidated the two appeals (nos. 23-6572, 23-7255). This Court has jurisdiction over the appeals pursuant to 28 U.S.C. § 1291.

## QUESTIONS PRESENTED

1.   Was the Government's theory of criminal liability with regard to both the wire fraud and securities fraud counts premised on a right-to-control theory that has since been rejected by the Supreme Court in *Ciminelli v. United States*, 598 U.S. 306 (2023), thereby warranting reversal of all counts of conviction?

2.   Did the District Court commit legal error in calculating loss under the Sentencing Guidelines as the equivalent of the total amount invested in Nanobeak Biotech, Inc., thus failing to exclude from the calculation losses caused by factors other than the fraud as required under controlling Second Circuit law?

3.   Did the District Court commit legal error in calculating restitution under the Mandatory Victim Restitution Act as the equivalent of the total amount invested in Nanobeak Biotech, Inc., thus failing to exclude from the calculation losses caused by factors other than the fraud as required by statute?

4.   Did the District Court commit legal error when it permitted a conscious avoidance charge to be given to the jury with respect to all counts of the indictment in the absence of a defense predicated on ignorance, or evidence in the trial record of conscious avoidance?

5.   Did the District Court commit plain error by giving a conscious avoidance charge to the jury that improperly allowed the jury (a) to consider

2

conscious avoidance as "another factor" to be considered in the context of determining knowledge, and (b) to apply conscious avoidance to the element of intent for the substantive counts?

      6.   Did the Government violate its obligations under *Giglio v. United States*, 405 U.S. 150 (1972) by intentionally withholding from the District Court and defense counsel the details of a material discrepancy between the testimony of the two FBI agents involved in taking the post-arrest statements from Mr. Barbera, thus allowing the Government to introduce and rely on highly prejudicial evidence, thereby depriving Mr. Barbera of a fair trial?

      7.   Did the District Court abuse its discretion by failing to reopen the pre-trial suppression hearing after learning of the material discrepancy between the testimony of the two FBI agents involved in taking the post-arrest statements from Mr. Barbera, thus failing to develop the complete record necessary for evaluating the voluntariness of Mr. Barbera's post-arrest statements?

      8.   Did the Government fail to introduce at trial sufficient evidence to support the jury finding that Mr. Barbera and unindicted co-conspirator Carl Smith had an agreement to commit an unlawful act as charged in Count One?

## STATEMENT OF THE CASE

### A.   Arrest and Trial of James Jeremy Barbera

James Jeremy Barbera was arrested by Special Agents of the FBI on December 9, 2020 pursuant to a criminal complaint, and subsequently indicted by a grand jury on March 8, 2021.  The Indictment charged the defendant with three counts:  conspiracy to commit wire fraud and securities fraud under 18 U.S.C. § 371 (Count One), a substantive count of securities fraud pursuant to 15 U.S.C. §§ 78j(b) and 78ff, and Rule 10b-5 of the Code of Federal Regulations (Count Two), and a substantive count of wire fraud under 18 U.S.C. § 1343 (Count Three). A24-36.

A trial was held before the Honorable John G. Koeltl from February 7 to February 17, 2022.  The jury was charged on February 15, 2022, and on February 17, 2022 rendered a verdict of guilty on all three counts.

### B.   The Government's Case at Trial

Although charged as a three-count indictment, the case was presented to the jury as a unitary scheme to defraud by which Mr. Barbera, the CEO of a biotech startup, made fraudulent misrepresentations to investors to induce them to buy shares in the company and then converted the corporate funds to his personal use.

Nanobeak Biotech, Inc. ("Nanobeak," the "Company") was a private Delaware corporation founded by Mr. Barbera in 2013 whose mission was to

design and market a biomedical device that could detect early-stage cancer and other diseases through human breath. The science behind Nanobeak's business plan was that human breath contains chemical metabolites (volatile organic compounds or "VOCs") that reflect the existence of certain diseases or drugs in the body, and that a biomarker "signature" can therefore be determined for each such condition. A515-16. The Company held licenses to patents for a breath-sensor device invented by the National Aeronautics and Space Administration ("NASA") which granted it the exclusive right to adapt the technology for commercial medical use. A476, 937. Nanobeak sought to develop the NASA device into a breathalyzer capable of detecting biomarker signatures for certain cancers in the body with the aim of providing medical practitioners with a rapid and non-invasive diagnostic tool.

To this end Nanobeak had two distinct research and development initiatives. The first was a Space Act Agreement with NASA authorizing the Government to work with the Company in adapting its existing device according to Nanobeak's specifications. A476. The other was a contract with Johns Hopkins University to conduct a clinical trial to identify a biomarker signature for stage 1 lung cancer. A506-07, 566, 1009.

Nanobeak was at the same time exploring applications of the breathalyzer for law enforcement purposes to detect the existence of certain illegal drugs in a subject's body. A566-68.

The Government's case-in-chief rested in principal part on the testimony of three corporate executives who testified about the Company, its operations, and Mr. Barbera's role there: (i) Board Chairman and successor CEO Thomas Joyce; (ii) Board member Joseph Peters; and (iii) Dheeraj Jain, the Company's Chief Technology Officer. The testimony of these three witnesses conclusively established that Nanobeak was a legitimate company with substantial potential to generate a breakthrough technology and a marketable product. Dr. Jain, for one, made clear that the breath-detection technology was scientifically valid, and that "with enough dividend and research and more work done, *anybody* can reach to that stage [i.e. adapting the NASA sensor to detect VOCs]." A515-16 (emphasis added). Mr. Joyce, for his part, affirmed that "I was a believer that the technology was real and that the opportunity was somewhere between large and huge." A378.

Despite the great promise of the Company, the prosecutors argued, and the jury found, that Mr. Barbera had overstated the progress of the technology and the prospects of the Company to investors, thus crossing the line between puffery and fraud. The Government called five individuals to testify at trial about the misrepresentations that Mr. Barbera made to them to induce them to invest in

6

Nanobeak: (i) Jaime Pike; (ii) Richard Fried; (iii) Robert Wood; (iv) Charles Bertucio; and (v) Egidio Farone. The misrepresentations identified by these witnesses fell into four basic categories: (i) Mr. Barbera's credentials; (ii) the progress and scope of the research and product launch; (iii) the timing of an initial public offering ("IPO"); and (iv) intended use of corporate funds. According to the Government, Mr. Barbera lied to investors about his education and credentials, falsely claiming, among other things, that he was a graduate of MIT, lied to investors that the device was already operational and ready for commercial production, lied to investors that an IPO was imminent, and lied to them about how their investment funds would be used by the Company.

Critical to the Government's theory of fraud was that the defendant made these false representations with the express intent to convert the investment proceeds to his own personal use. The Government established at trial through Nanobeak bank account records that Mr. Barbera used a substantial portion of Company funds for personal expenses. According to the testimony of FBI Special Agent Kirsten Allain, who aggregated the data from the bank records, the Company received $8,413,375 of investor monies from January 2016 to April 2020, A1090, of which $3,297,647 went to pay for "Non-Business Expenses" for the benefit of Mr. Barbera. A1091. The trial record further reflected, however,

that Mr. Barbera did not receive any formal compensation during the relevant time frame.  A704.

The Government's proof of criminal intent was based in substantial part on two statements made by the Defendant at the time of his arrest.  Special Agent Kirsten Allain testified that after his arrest Mr. Barbera stated that (i) he had "exaggerated" to investors because "everyone exaggerates"; and that (ii) he acknowledged that he had done something wrong because he was "sloppy" in "mix[ing] personal and professional expenses in the Nanobeak account."  A741-42.  The Government further sought to establish Mr. Barbera's criminal intent by establishing that when Mr. Barbera's use of corporate funds for personal purposes was uncovered, Mr. Barbera was promptly suspended as an officer and employee of the Company.  A334, 604, 1094.

Once Mr. Barbera left the helm, the Company continued to pursue its commercial objectives.  Board Director Peters testified that without Mr. Barbera in charge, and with "renowned, reputed" Tom Joyce in his place, he expected the Company would be able to move forward "the way that it should."  A603-04.  And soon after he took over, Mr. Joyce, a prominent and seasoned corporate executive, was well on the way to making this opportunity a realistic prospect:  "We raised the money.  Again, I can't remember the exact amount.  It was less than a million.

We raised the amount of money we thought sufficient to run a proof of concept trial."  A386.

The Company could not, however, gain traction under Mr. Joyce's leadership.  As Mr. Joyce explained to the jury, despite the bright prospects for the Company's technology, "we ran into something I think we're all in this room pretty familiar.  We ran into Covid."  A386.

While the defense introduced a number of exhibits in its case, Mr. Barbera did not take the stand, nor did any other witness testify for the defense.

### C.    The November 4, 2021 Suppression Hearing

In advance of trial, the defense moved to suppress the post-arrest statements taken from Mr. Barbera at the time of his arrest on December 9, 2020.  In support of this application, Mr. Barbera submitted a sworn declaration stating that he was suffering from COVID-19 and pneumonia at the time of his arrest, "was feeling very ill," had no recollection of receiving a *Miranda* warning, and found it "difficult to focus because of my symptoms."  A38-39.  At the evidentiary hearing held on November 4, 2021 (the "Suppression Hearing") the prosecutor told the Court that while two FBI Special Agents (Jonathan Polonitza and Kirsten Allain) had been present when Mr. Barbera made his statements, the Government would be calling Special Agent Polonitza as its "first and only witness."  A44.  As the prosecutor explained, "To the extent your honor wants to hear from Special Agent

9

Allain, she could also testify because she was there for the arrest, but she would be *duplicative*." A44 (emphasis added). At the Government's request, the Court allowed Agent Allain, the non-testifying agent, to remain in the courtroom during the testimony of her colleague. A44-5.

After hearing the testimony of Agent Polonitza and receiving briefing from the parties, the Court issued an oral ruling from the bench on December 16, 2021. A135-150. The Court denied the motion to suppress, finding -- based on the "credible sworn testimony" of Agent Polonitza -- that the Government had sustained its burden of establishing that the Defendant was read his *Miranda* rights and knowingly and voluntarily waived those rights when he "initiated conversation" with the Agent about his case and his conduct at the Company. A146-149.

### D. The District Court's Rule 33 Decision

In a post-trial Motion pursuant to Rule 33 of the Federal Rules of Criminal Procedure, Mr. Barbera raised five issues, two of which are relevant to this appeal. *United States v. Barbera*, 21 Cr. 154 (JGK), ECF 128.

Mr. Barbera argued that he was entitled to a new trial because the Government had failed to disclose that the FBI Agents' separate accounts of the arrest of defendant – one provided at the Suppression Hearing by Agent Polonitza, the other at trial by Agent Allain -- were "wholly incompatible" with each other.

10

*United States v. Barbera*, 21 Cr. 154 (JGK), ECF 128, at 5. The Court denied the request for a new trial on this ground. While acknowledging that there was indeed a discrepancy between the two agents' accounts of the arrest, the Court concluded that the only difference was "whether the defendant or SA Polonitza started the interview," and that this difference did not "render the rest of SA Polonitza's testimony incredible" nor change the Court's conclusion that the defendant knowingly and voluntarily waived his right to remain silent after receiving a *Miranda* warning. SPA 10.

In a second challenge to the conviction, Mr. Barbera argued that the District Court erred in instructing the jury on conscious avoidance without a proper factual predicate for such an instruction. Consistent with its prior ruling at the charging conference during the trial, the District Court concluded that the charge was proper in light of the fact that "the defendant received updates about various projects that should have put him on notice that some of his representations to investors were not true, and the defendant deliberately failed to determine whether his representations were true." SPA 19. The Court also found that the defendant was not prejudiced by the instruction "in view of the substantial evidence against the defendant, including evidence of his actual knowledge of the falsity of his representations." SPA 21.

### E.     The May 4, 2023 Sentencing Hearing

At the sentencing hearing, the District Court made key findings relevant to its calculation of loss under the Sentencing Guidelines.  The Court found that Mr. Barbera had raised approximately $988,000 from the five investors who testified at trial, and substantially more from other non-testifying investors whose investments were documented at sentencing by the Government.  A1113.  Based on FBI affidavits attesting to misstatements that the Defendant had allegedly made to these additional investors to induce them to invest, the Court concluded that those additional investments should also be included in the loss calculation.  *Id*.  In sum, the Court found that at least $7,026,150 in investor funds had been remitted to the Company based on the Defendant's false inducements.  *Id*.  The Court also found that no funds had been returned to these investors.  *Id*.

In determining the Guidelines loss enhancement, the Court observed that "in investment fraud cases such as this one, where a defendant fraudulently induces victims to invest, courts have found an appropriate measure of loss to be the amount that the defendant induced the victims to invest, less anything the victims received in return."  A1111-112.  Applying this formula to the case at hand the District Court held that, "[b]ecause these investors 'put money into a fraudster's hands, and ultimately received nothing of value in return," [*United States v*.] *Hsu*,

12

669 F.3d at 121 [(2d Cir. 2012], $7,026,150 is an appropriate measure of loss." A1113.

The Court rejected the defense's argument that the defendant's fraudulent representations were not the proximate cause of the investors' losses, concluding that the evidence of reliance was sufficient to sustain the Government's burden. Defendant's "material misrepresentations concerning his credentials, the breathalyzer device, the asserted imminence of the initial public offering ("IPO"), and business expenses directly induced investors to invest in Nanobeak." A1115-116.

Based on these conclusions of law and findings of fact, the Court determined that an 18-level loss enhancement from the base level of 7 for Section 2B1.1 was appropriate. Applying 2 additional levels for violation of a prior order and another 2 levels for the "10 or more victims" enhancement, the Court reached a total offense level of 29 which carries an imprisonment range of 87 to 108 months. A1155. Finding that "the sentencing guidelines for fraud offenses are not the best indicators of the relevant factors for sentencing because they are so dependent on the single criteria of monetary loss," the Court departed downward and imposed a sentence of 48 months' imprisonment on all three Counts to run concurrently, to be followed by a three-year term of supervised release. A1156; SPA 27-8. In

13

addition the Court imposed an order of forfeiture in the amount of $7,026,150.

A1157; SPA 28.

At the sentencing hearing, the District Court deferred ruling on restitution.

### F.    The Board Minutes Introduced at Sentencing

In connection with sentencing, Mr. Barbera provided the Court with a piece

of evidence that had not been introduced at trial, but which critically altered the

assessment of the severity and scope of the criminal conduct Mr. Barbera had been

convicted of.  This was a set of Nanobeak Board Minutes memorializing a series of

resolutions that the Board had reached on December 10, 2019.  A1165-1172.  At

that meeting the Board confronted Mr. Barbera's use of Company funds for

personal expenditures and decided to suspend Mr. Barbera as an officer and

employee of the Company and to undertake a forensic examination of its accounts.

A1171.  At the same time, however, the Board resolved to retroactively approve a

salary for Mr. Barbera of $300,000 per year in recognition of his prior seven years

of service to the Company (resulting in a total compensation of $2.1 million),

effectively ratifying Mr. Barbera's use of a significant portion of the funds for

personal purposes over the prior years.  A1169.  In the event that the Board

determined that Mr. Barbera had incurred additional expenses over and above the

approved salary, the Board decided that Mr. Barbera would reimburse the

14

Company for such expenses with a release of shares back to the Company priced at $0.33 per share.  A1169.

### G.     The District Court's September 13, 2023 Restitution Order

On August 7, 2023, at the Court's invitation, Mr. Barbera submitted a letter brief addressing the standard for restitution and arguing that none was warranted in the case.  *United States v. Barbera*, 21 Cr. 154 (JGK), ECF 217.

On September 19, 2023, the Court issued a Memorandum Opinion and Order rejecting Defendant's arguments and ordering restitution in the amount of $6,926,150.  SPA 36-42.  Holding that the proximate cause requirement for restitution is the same as that which applies to loss under the Guidelines, the Court explained that it had already rejected Defendant's proximate cause analysis in the context of the sentencing loss calculation.  A39-40.  Relying on the Second Circuit's analysis in *United States v. Goodrich*, 12 F.4th 219 (2d Cir. 2021), the District Court found that the Government had established proximate causation by virtue of the fact that "the defendant's misrepresentations caused the investors to invest by misrepresenting the prospects of Nanobeak including its management and technology, and the losses were foreseeable to the defendant because the defendant knew the representations were false and that he caused the investments." SPA39-40.  Although acknowledging Defendant's argument that there were intervening factors that "broke the chain of proximate cause," the Court rejected

those considerations, concluding instead that the investors had been fraudulently induced by "misrepresentations that concerned the value of the company and its technology which were never cured," and that there can be more than one proximate cause of a particular harm. A39-41.

### H. The District Court's Declination to Issue an Indicative Ruling

In a letter dated August 31, 2023, Mr. Barbera sought an indicative ruling from the District Court pursuant to Rule 37 of the Federal Rules of Criminal Procedure regarding whether the recent decision by the Supreme Court in *Ciminelli v. United States*, 598 U.S. 306 (2023) warranted vacatur of his convictions on all three counts of the Indictment. *United States v. Barbera*, 21 Cr. 154 (JGK), ECF 221. In a Memorandum Opinion and Order dated September 18, 2023, SPA32-35, the District Court declined the invitation, finding that the *Ciminelli* argument did not raise a "substantial question." Observing that the jury instructions in this case did not reference any "right to control" theory, the Court concluded that "there is nothing in the *Ciminelli* decision that casts any doubt on the validity of the" convictions in the case. SPA34.

### SUMMARY OF ARGUMENT

Mr. Barbera appeals his conviction and sentencing on the basis of eight distinct arguments:

The Government's theory of criminal liability on both the wire fraud and securities fraud counts was premised on a right-to-control theory as first articulated in *United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991), that has since been rejected by the Supreme Court in *Ciminelli v. United States*, 598 U.S. 306 (2023), requiring reversal of all counts of conviction under a plain error standard of review.

In determining the Sentencing Guidelines range, the District Court calculated loss as the equivalent of the total amount invested in Nanobeak, thus failing to exclude from the calculation losses caused by factors other than the fraud. In this way, the District Court failed to undertake the appropriate proximate cause analysis for shareholder fraud cases as required under *United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006) and *United States v. Rutkoske*, 506 F.3d 170 (2d Cir. 2007), thereby warranting a remand for re-sentencing.

In the same way, the District Court failed to apply the appropriate proximate cause analysis in calculating restitution under the Mandatory Victim Restitution Act ("MVRA"), Pub L. No. 104–132, 110 Stat. 1227 (codified at 18 U.S.C. § 3663A and other provisions of Title 18), resulting in a restitution award that was in violation of the MVRA. *U.S. v. Gushlak*, 728 F.3d 184 (2d Cir. 2013).

The District Court committed legal error when it permitted a conscious avoidance charge to be given to the jury with respect to all counts of the indictment

in the absence of a defense predicated on ignorance, or evidence in the trial record of conscious avoidance. As the evidence of knowledge introduced at trial was not overwhelming, the error was not harmless, and remand for a new trial is required for all counts of conviction. *United States v. Aina-Marshall*, 336 F.3d 167 (2d Cir. 2003); *United States v. Ferrarini*, 219 F.3d 145 (2d Cir. 2000).

The District Court committed plain error by giving a conscious avoidance charge to the jury that incorrectly stated the legal standard, improperly allowing the jury to consider conscious avoidance as "another factor" to be considered in the context of determining knowledge, and improperly allowing the jury to apply conscious avoidance to the element of intent for the substantive counts, thereby requiring remand for a new trial on all counts of conviction. *United States v. Kaplan*, 490 F.3d 110 (2d Cir. 2007); *United States v. Samaria*, 239 F.3d 228 (2d Cir. 2001), *rev'd on other grounds by United States v. Huezo*, 546 F.3d 174, 180 n.2 (2d Cir. 2008).

The Government violated its obligations under *Giglio* by intentionally withholding from the District Court and defense counsel the details of a material discrepancy between the testimony of the two FBI agents involved in taking the post-arrest statements from Mr. Barbera, ensuring that highly prejudicial evidence was introduced to the jury, and thus depriving Mr. Barbera of a fair trial on all

counts of conviction. *United States v. Coppa*, 267 F.3d 132 (2d Cir. 2001); *United States v. Taylor*, 745 F.3d 15 (2d Cir. 2014).

The District Court abused its discretion by declining to reopen the Suppression Hearing in order to develop a full and complete factual record of the Government's conduct leading to Mr. Barbera's post-arrest statements, thereby maintaining an evidentiary ruling that failed to properly assess voluntariness. *United States v. Anderson*, 929 F.2d 96 (2d Cir. 1991); *United States v. Taylor*, 745 F.3d 15 (2d Cir. 2014).

The Government failed to introduce at trial any evidence that Mr. Barbera and unindicted co-conspirator Carl Smith had an agreement to commit an unlawful act, thereby requiring reversal of the conspiracy charge in Count One. *United States v. Pearlstein*, 576 F.2d 531 (3d Cir. 1978); *Samaria*, 239 F.3d 228.

## ARGUMENT

### I. The Convictions Must be Reversed Under *Ciminelli*.

#### A. The *Ciminelli v. United States* Decision.

In its recent decision in *Ciminelli v. United States*, 598 U.S. 306 (2023), the Supreme Court rejected the "right-to-control" theory of liability as applied in a prosecution brought pursuant to 18 U.S.C. § 1343. 598 U.S. 306, 314-15 (2023). The Court's ruling was directed specifically at a line of cases arising out of the Second Circuit's decision in *United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991)

which had adopted the theory that a "cognizable harm [under the wire fraud statute] occurs where the defendant's scheme denies the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions." *Id*. at 313, citing *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015). The *Ciminelli* Court held that the intangible property interests recognized in such right-to-control cases were not contemplated by the wire fraud statute, and that prosecutions under the statute must be limited to fraudulent schemes that impact only traditional property rights arising under the common law. The Court made clear that its construction was not limited to the wire fraud statute alone but extended to "federal fraud statutes" generally, and to any other "federal fraud theories that stray from traditional concepts of property." *Id*. at 315-16 (internal quotation marks omitted).

As the theory of criminal liability advanced by the prosecution in this case on both the wire fraud and securities fraud counts was based on the right-to-control construct adopted by this Circuit in *Wallach*, the convictions cannot stand under the Supreme Court's new controlling authority. The impact of a supervening change in the law is reviewed for plain error. *United States v. Balde*, 943 F.3d 73, 96-97 (2d Cir. 2019).

**B. <u>The Second Circuit's *Wallach* Decision.</u>**

In *Wallach*, the Second Circuit addressed a criminal enterprise involving directors and officers of the Wedtech Corporation, a small metals parts manufacturer in New York. Wayne Franklin Chinn, a director of the company, Robert Wallach, a lobbyist, and Rusty Kent London, a consultant in financial management, were all three convicted under RICO and the mail fraud statute, and with respect to Chinn and London, securities fraud under Rule 10b-5 as well. One transaction that was of particular relevance to the appeal was a scheme to pay London $1 million for his services in assisting the corporation with its second public offering. As part of the arrangement, Chinn, Wallach, and the president of Wedtech, received kickbacks, secretly channeled through their respective corporate alter-egos. These kickbacks were not disclosed, and the company financials provided to shareholders in connection with the company's second public offering were therefore incorrectly stated. The Government charged the defendants with defrauding not only the company, but also its shareholders. The defendants challenged the convictions under the mail fraud statute on the theory that shareholders had not been deprived of any property. In defending the convictions, the Government argued that by embezzling funds from the company, the defendants had "denied the shareholders the 'right to control' how corporate assets were spent – an intangible property interest." *Id.* at 462. In upholding the convictions under 18 U.S.C. § 1343, this Court accepted this premise, but added

21

the additional requirement that such corporate misappropriation had to be coupled with some form of deception, whether of management or investors, to bring it within the ambit of the mail fraud statute.  Thus, the Second Circuit concluded that application of such a right-to-control theory to the mail fraud statute "is predicated on a showing that some person or entity has been deprived of potentially valuable economic information.  Thus the withholding or inaccurate reporting of information that could impact on economic decisions can provide the basis for a mail fraud prosecution."  *Id*. at 462-63.  As the Court explained, "when intentionally deprived of accurate information regarding how corporate assets are being spent, a shareholder's investment is placed at great risk.  If corporate officers and directors, and those acting in concert with them, were free to conceal the true nature of corporate transactions, it is conceivable that the assets of the corporation could be so dissipated as to render a shareholder's investment valueless."  *Id*. at 463.

The *Wallach* decision -- the root of the right-to-control theory -- has now been squarely rejected by *Ciminelli*.

**C.  The Wire Fraud Conviction was Based on a Right-to-Control Theory.**

The Government's theory of fraud was premised on an act of corporate mismanagement:  Mr. Barbera's use of company monies for personal expenditures.

But such a theory of harm implicates the right-to-control framework adopted in *Wallach* which now runs afoul of *Ciminelli*.

There was no dispute in this case that each of the investors in Nanobeak received shares in the Company in exchange for their investments. And the minute investors received stock certificates in return for their money they became shareholders in Nanobeak, and the funds they tendered became corporate assets to be spent as the Company (governed by the Board) deemed appropriate under the business judgment rule. There was no claim that Nanobeak was a sham. To the contrary, the backbone of the Government's case was the testimony of two key stakeholders in the Company, the successor CEO Thomas Joyce, and the director, Joseph Peters, both of whom testified to the value of the Company and its legitimate commercial prospects. A367, 378, 631-33, 693. The entire focus of the Government's case, then, was on misuse or misappropriation of corporate assets. As the Government made clear in a variety of statements to the jury:

> "It wasn't just that the defendant stole the money. It's that he stole the money at the expense of all of the other payments Nanobeak needed to make in order for the technology to maybe some day work." A797.

> "So the defendant made a choice. He could have chosen to pay NASA. Instead he used investor money for personal expenses, contrary to what he told them he would do." A855.

Although the Government routinely (and perhaps intentionally) obscured the distinction, it is clear from the context that the theft the prosecutors were

23

identifying was theft from the Company, not from investors. *See* A800. Particularly telling in this regard was the Government's focus on the high interest loans that Mr. Barbera signed for on behalf of the Company. A744-46; 792-93. These purely internal corporate transactions may have been objectionable as exercises of bad business judgment, but that is all.[1] But these transactions are of a piece with all the other expenditures identified by the Government because they evidence poor or improper decisions as to how *corporate* funds are to be spent.

Understood in the proper light, then, the Government's theory of fraud was not that Mr. Barbera stole money directly from the investors, but rather, that he engaged in a secondary act of embezzlement *from the Company*. In this way, the only conceivable harm to property at issue in the case could be indirect (and potential) impairment of share value. As the *Wallach* court explained "shares of stock are property, but they are intangible and incorporeal property existing only in abstract legal contemplation." *Wallach*, at 462 (*citing* 11 Fletcher § 5097, at 92). This is precisely the type of intangible property interest that the Supreme Court has held is no longer protected by the wire fraud statute.

---

[1] And, in any event, the Board was aware that the Company was paying over $1 million per year in debt service. A974.

Consistent with its *Wallach* theory of fraud, the Government repeatedly focused the jury's attention on how investors were deprived of valuable economic information about how the corporate funds were to be spent:

> "But when you intentionally tell investors false things to get their money and when you take that money and you put it into your pocket *instead of spending it the way you told investors you would*, that's not dreaming big. That's not being a visionary. That's swindling investors. It's cheating, it's dishonest, and it's a crime."

A775 (emphasis added).

> "Taking investors' money, claiming you're going to use it on research and development, and then spending it for your mother's care . . . It's a crime. It's lying to investors and it's lying to them about something at the core of what they care about . . . *It was important to them how their money was going to be used. They were investing in what they thought was a company, not in the defendant's personal piggy bank.*"

A849-50 (emphasis added).

And the prosecution made clear that this was information that the defendant hid not only from investors, but from the Board as well;

> "He didn't want the board to know that and that's why he created these *fake financials* to give to the board."

A800 (emphasis added).

Thus, all of the elements of a *Wallach* theory of liability are present in this case: (i) internal corporate mismanagement and embezzlement; (ii) hidden from the board, shareholders and prospective investors; (iii) thereby depriving

shareholders of key economic information relevant to managing their interests in the company.

As the Government's entire theory of criminal liability was not one of *direct* property theft, it could only be one of *indirect* (and only potential) impairment of share value through the secondary act of embezzlement or mishandling of corporate finances. As such it was a prosecution based on intangible property rights that are no longer protected by the "scheme to defraud" language of the federal fraud statutes. In a recent decision, this Court has acknowledged that an investor fraud theory predicated on diversion of corporate funds represents "mere deception without harm to property rights" which is no longer sufficient to state a federal fraud claim under *Ciminelli*. *Securities and Exchange Commission v. Govil*, 86 F.4th 89, 105 (2d Cir. 2023).

"Under plain error review, [this Court] consider[s] whether (1) there is an error; (2) the error is clear or obvious . . . ; (3) the error affected the appellant's substantial rights; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Capers*, 20 F.4th 105, 116 (2d Cir. 2021) (internal quotation marks and citations omitted). Whether an error is "plain" is determined by reference to the law at time of appeal. *United States v. Garcia*, 587 F.3d 509, 520 (2d Cir. 2009). As the evidence admitted of no alternative theory of wire fraud based on any traditional notion of property theft,

the conviction and the indictment both fail on a sufficiency basis under *Ciminelli*. *See United States v. Aleynikov*, 676 F.3d 71, 73, 75 n.2 (2d Cir. 2012) (reversing conviction where defendant's "conduct did not constitute an offense under either statute" and treating sufficiency of evidence and sufficiency of indictment as analytically the same). Thus, the Government's erroneous right-to-control theory was outcome determinative for the wire fraud count, affecting Mr. Barbera's substantial rights and the fairness of the proceedings. *United States v. Marcus*, 560 U.S. 258, 262, 265-66 (2010); *Capers*, 20 F.4th at 123, 127-28.[2]

### D. <u>The Securities Fraud Conviction was Based on a Right-to-Control Theory.</u>

In *Ciminelli*, the Court made clear that its ruling was applicable to the "federal fraud statutes" as a whole, and did not evince any hesitation in limiting the application of its holding simply to 18 U.S.C. § 1343. The Court's rejection of the right-to-control theory in the context of the wire fraud statute thus applies with

---

[2] In declining to entertain an indicative ruling on the *Ciminelli* issue, the District Court appeared to conclude that the mere absence of a jury charge on the right to control was sufficient to bring the Barbera prosecution out of the ambit of the Supreme Court's holding. SPA34. But this cannot be the rule. While there was no language in the jury charge expressly articulating the right-to-control theory, the charge as stated did not expressly *preclude* the jury from applying such a theory in evaluating the case. In *Ciminelli*, moreover, the Court reversed not only because of the erroneous jury charge language but also because the Government's "trial strategy rested solely on that theory." *Ciminelli*, at 310-11. And the Court reversed the conviction in spite of "profuse citations" by the Government to evidence arguably supporting a traditional fraud theory. *Id*. at 316-17.

equal force to the securities fraud violation charged in this case under 17 C.F.R. § 240.10b-5. As subsection (a) of Rule 10b-5 employs a virtually identical formulation as that in the wire fraud statute -- "device, scheme or artifice to defraud" -- it follows that the Court's new limitation on the meaning of "scheme to defraud" controls the parallel language in the securities fraud provisions.

At the time that the Securities and Exchange Act was passed in 1934, and Rule 10b-5 was promulgated in 1942, "scheme to defraud" was already a well-established legal construct. It is axiomatic that "[w]here Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *In re Chateaugay Corp.*, 89 F.3d 942, 947 (2d Cir. 1996) (internal quotation marks and citation omitted). The Supreme Court has consistently made clear that in employing the phrase "scheme to defraud" in the context of the federal fraud statutes generally, Congress expressed no intent to "depart from the common understanding" that "the words 'to defraud' commonly refer 'to wronging one in his property rights.'" *Cleveland v. United States*, 531 U.S. 12, 19 (2000) (internal alterations omitted), citing *McNally v. United States*, 483 U.S. 350, 358-59 (1987). Section 10(b) and Rule 10b-5 have similarly been read against the backdrop of the common law. As this Circuit recognized in *United States v. Chestman*, "[n]either the language of Rule

28

10b-5, SEC discussions of the rule, nor administrative interpretations of the rule offered any evidence that the SEC, in drafting Rule 10b-5, intended the rule to go beyond common law fraud." 947 F.2d 551, 561 (2d Cir. 1991).

The *Ciminelli* Court's policy concern that the federal fraud statutes not be interpreted in such a way as to "make[] a federal crime of an almost limitless variety of deceptive actions traditionally left to state contract and tort law" and to avoid a construction that "federalizes traditionally state matters," *Ciminelli*, 598 U.S. at 1128, fits hand in glove with the Supreme Court's long-standing interpretative stance with respect to the securities fraud provisions themselves. As Justice Byron White explained in construing Section 10(b) and Rule 10b-5 in *Santa Fe Industries, Inc. v. Green*, the Court is leery of interpretations that "would . . . bring within the Rule a wide variety of corporate conduct traditionally left to state regulation." 430 U.S. 462, 478-79 (1977). And of particular relevance to the case at hand the Court has stated elsewhere that, "[w]e agree that Congress by s 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement." *Superintendent of Ins. of State of N.Y. v. Bankers Life & Cas. Co*., 404 U.S. 6, 12 (1971); *see also SEC v. Zandford*, 535 U.S. 813, 820 (2002) ("the statute must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b)"). But that is exactly what the Government has attempted to do here, convert a case of

29

corporate mismanagement (Barbera's misuse of corporate funds and recourse to high interest loans) into a criminal securities fraud violation. The Court's decision in *Ciminelli* now makes clear why this is an improper extension of the statutory ambit of Section 10(b). As a Delaware corporation, Nanobeak was already subject to a robust legal regime under state law that would have been sufficient for addressing any considerations of misuse of corporate funds.

In a recent ruling, albeit in the civil context, this Court has already applied a *Ciminelli* gloss to Section 10(b) and Rule 10b-5, concluding that "under common law deceit and misrepresentation . . . pecuniary harm is an element of the claim," and that therefore "the right to make informed decisions about the disposition of one's assets" is not the type of tangible property interest protected by the securities fraud provisions. *Govil*, 86 F.4th at 105 (internal quotation marks omitted).

While the statutory language, interpretive history, and policy considerations clearly place Rule 10b-5 squarely within the ambit of *Ciminelli*, to the extent that there is any ambiguity in the meaning of the operative words "device, scheme or artifice to defraud," the rule of lenity requires a deferential application. *United States v. Santos*, 553 U.S. 507, 514 (2008) (the rule of lenity "requires ambiguous criminal laws to be interpreted in favor of the defendants subject to them"); *Cleveland*, 531 U.S. at 25 ("In deciding what is 'property' under 1341, we think it is appropriate, before we choose the harsher alternative, to require that Congress

30

should have spoken in language that is clear and definite.") (internal citation and quotation marks omitted). This Circuit has already refused to broaden the scope of fiduciary duty in insider trading cases brought under Rule 10b-5, observing that "we tread cautiously in extending the misappropriation theory to new relationships, lest our efforts to construe Rule 10b-5 lose method and predictability, taking over the whole corporate universe." *Chestman*, 947 F.2d 551, 567 (internal citation and quotation marks omitted). The Circuit has likewise tread lightly in construing other criminal statutes involving traditional concepts of property. *See United States v. Aleynikov*, 676 F.3d at 79, 82. By the same token, lenity calls here for barring extension of Section 10(b) to cover intangible property rights.

While Rule 10b-5 has three alternative prongs, each of which was explained to the jury in this case, and each of which would have been sufficient to convict on the substantive securities fraud charge, reversal is still warranted. As a general rule, "when disjunctive theories are submitted to a jury and the jury renders a general verdict of guilty," the verdict must be reversed if one of the theories was "legally insufficient." *United States v. Garcia*, 992 F.2d 409, 416 (2d Cir. 1993). In the context of plain error review, appellant must show that the legal error was "*not* harmless beyond a reasonable doubt." *Capers*, 20 F.4th at 126 (internal quotations marks and citations omitted). Here there can be little question that "there is a reasonable likelihood that the jury may have returned a guilty verdict

31

based on a theory that it was erroneously told would justify a conviction for violating the statute under which the defendant was charged." *Id*. at 128.

The language of the indictment and the Government's arguments to the jury made clear that Mr. Barbera was only being held criminally liable under the "scheme to defraud" prong of Rule 10b-5. And as this Court has concluded, it is "overwhelmingly likely that any reasonable juror would have convicted on the basis of the Government's primary theory." *United States v. Skelly*, 442 F.3d 94, 99 (2d Cir. 2006). The "to wit" clauses of both the substantive wire fraud (Count Three) and securities fraud (Count Two) counts were identical: "BARBERA made material misrepresentations and omissions to Company 2 investors, *and* misappropriated investor funds for his own use." A32-33 (emphasis added). Thus, the jury was directed to conclude that the conduct that rendered Mr. Barbera guilty on the wire fraud count was the same conduct that rendered him guilty on the securities fraud count. As the prosecutor explained in its opening, "Ladies and Gentlemen of the jury, that's why we're here today, because misleading investors to get their money and then stealing the money for yourself is a crime. It's called securities fraud." A173. And the Government made no attempt to differentiate the evidentiary bases for each separate charge. Instead, the Government argued a unified theory of fraud for the entire case. As the Government made clear in its

final words to the jury: "There is no reasonable doubt that the defendant engaged in *this fraud scheme*." A861 (emphasis added).

For these reasons, the erroneous *Ciminelli* theory infected the jury's deliberations on the securities fraud count, making it "impossible to be confident that the jury convicted [Mr. Barbera] on an appropriate set of findings," and thus impacting the fairness and integrity of the trial. *Capers*, 20 F.4th at 128.

## II. The District Court's Calculation of Loss under the Sentencing Guidelines was Legally Incorrect.

In determining the appropriate enhancement under the Section 2B1.1 of the Sentencing Guidelines, the District Court calculated loss based on the following formula: the "amount that the defendant induced the victims to invest, less anything the victims received in return." A1112. This formula was legally incorrect in a case such as this one which involved equity holders in a legitimate corporate entity.

The District Court calculated a total investment figure of $7.026 million which it discounted by zero based on the conclusory trial testimony that the Nanobeak shares were worthless. This calculation resulted in an 18-level enhancement in Mr. Barbera's base offense level of 7 (Guidelines Section 2B1.1) leading to an overall offense level of 29 which carries a range of imprisonment between 87 to 108 months.

33

Although the Court departed downward from this range, imposing a relatively lower sentence of 48 months, this Court has made clear that the proper starting point for any sentencing is an accurate calculation of the applicable Guidelines range. *United States v. Dorvee*, 616 F.3d 174, 180 (2d Cir. 2010). "An error in determining the applicable Guidelines range . . . would be the type of procedural error that could render a sentence unreasonable under [*United States v.* ] *Booker* [543 U.S. 220 (2005)]." *United States v. Selioutsky*, 409 F.3d 114, 118 (2d Cir. 2005); *cf. United States v. Gamez*, 577 F.3d 394, 401 (2d Cir. 2009).

This Court reviews a district court's legal application of the Guidelines *de novo*. *United States v. Preldakaj*, 489 Fed. App'x 507, 510 (2d Cir. 2012) (summary order).

In calculating Guidelines loss in shareholder fraud cases this Circuit has consistently adopted the general principles of loss causation and proximate cause that have been developed in the civil securities fraud context. As this Court observed in *United States v. Rutkoske*, "we see no reason why considerations relevant to loss causation in a civil fraud case should not apply, at least as strongly, to a sentencing regime in which the amount of loss cause by a fraud is a critical determinant of the length of a defendant's sentence." 506 F.3d 170, 179 (2d Cir. 2007) (following proximate cause analysis of *Dura Pharmaceuticals, Inc. v.*

34

*Broudo*, 544 U.S. 336 (2005)); *United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir. 2006).

"Loss causation is a fact-based inquiry," *Lentell v. Merrill Lynch*, 396 F.3d 161, 174 (2d Cir. 2005), which in the shareholder context is complicated by the "tangle of factors affecting [share] price." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 343. The securities fraud provisions are not designed to "provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Id.* at 345. In undertaking the loss causation analysis in a typical civil securities fraud case, therefore, a court must isolate with some degree of precision the specific impact that a particular fraudulent misrepresentations has on share value. "[A] misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor." *Lentell*, 396 F.3d at 173. In other words, there must be a "relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant." *Id.* at 174.

Following this analytical framework, this Court in *United States v. Ebbers* has instructed that in calculating loss enhancement in shareholder fraud cases "[t]he loss must be the result of the fraud," and moreover that "losses from causes

other than the fraud *must be excluded* from the loss calculation." 458 F.3d 110, 128 (emphasis added); *Rutkoske*, at 179 ("portion of a price decline caused by other factors must be excluded from the loss calculation"); *see also United States v. Balwani*, 5:18-cr-258, 2023 WL 2065045, at *4 (N.D. Cal. Feb. 16, 2023) (calculating loss by excluding "inherent value" of stock absent the fraud).

In calculating loss as simply the equivalent of the total amount invested by shareholders in Nanobeak, the District Court failed to take into account what inherent or intrinsic value the Nanobeak shares held by virtue of the Company's legitimate business prospects, and to analyze and weigh the factors that were at play in causing the Nanobeak stock value ultimately to decline over the two-year period following the revelation of Mr. Barbera's conduct and his departure from the Company.

In this case there was never any dispute that Nanobeak was a real company with a real asset in the form of valuable licenses from NASA and ground-breaking clinical findings from Johns Hopkins. Indeed, the Government's case-in-chief was founded in large part on the credibility of key participants in the Company's operations: Nanobeak's successor CEO Tom Joyce, Board member Joseph Peters, and the Chief Technology Officer Dheeraj Jain. And the Government sought to prove criminal intent in part by establishing that when Mr. Barbera's use of corporate funds for personal purposes was uncovered, he was promptly removed as

an officer and employee of the Company. But these facts cut directly against the Court's finding of loss. After Mr. Barbera left the Company, Mr. Joyce managed the business for a year until October 2020, and a year after that Nanobeak filed for bankruptcy. *United States v. Barbera*, 21 Cr. 154 (JGK), ECF 157, at 38. The removal of Mr. Barbera as CEO, his suspension as an officer and employee of the Company two months later in December 2019, and the continuing operation of the Company for two more years thereafter created a meaningful break in the chain of causation. "When a significant period of time has elapsed between the defendant's actions and the plaintiff's injury, there is a greater likelihood that the loss is attributable to events occurring in the interim." *First Nationwide Bank*, 27 F.3d 763, 772 (2d Cir. 1994); *see Dura*, 544 U.S. at 343 ("the longer the time between purchase and sale . . . the more likely that other factors caused the loss").

To disentangle all the possible causal factors that led to the demise of Nanobeak in the two years since Mr. Barbera's departure required a careful quantitative analysis. *Rutkoske*, 506 F.3d at 180 ("Normally, expert opinion and some considerations of the market in general and relevant segments in particular will enable a sentencing judge to approximate the extent of loss caused by a defendant's fraud."); *cf. U.S. v. Gushlak*, 728 F.3d 184, 197 (2d Cir. 2013).

In this case, however, the Government completely failed to carry its burden of proof in establishing the necessary links in the chain of causation, and thereby

37

disentangling the various factors leading to the final demise of Nanobeak and the consequent loss to the investors. And the District Court, following the prosecutors' lead, likewise failed to undertake any analysis that would have allowed it to reasonably apportion the loss in such a way as to single out the effect of the fraud, if any, on the share decline. Instead, the District Court simply equated loss with the total amount invested.

This Court's decision in *United States v. Leonard* makes clear that such a "but-for" analysis constitutes reversible error. 529 F.3d 83, 93 (2d Cir. 2008). In *Leonard*, this Court addressed a securities fraud case in which the defendants solicited investments in two movie production projects without disclosing the enormous commissions they were retaining. *Id*. at 93. In sentencing the defendants in that case the district court calculated the loss as "the entire cost of the securities sold by the appellants." *Id*. The court did so simply on the basis that the investors would not have purchased the shares had they known the true size of the sales commissions. On appeal this Court reversed, rejecting the trial court's analysis as it failed to take into account the "actual value of the instruments" that the investors had received. As this Court explained, following the guidance of *Ebbers* and *Rutkoske*, "the securities the investors received in exchange for their contributions were [not] entirely without value. After all, the investors did obtain an interest in a company engaged in producing and distributing a motion picture."

38

*Id.* Concluding that the district court "erred in not deducting from the purchase price the actual value of the instruments," the court remanded for a new loss analysis. *Id.*

The District Court made the same error here, and its failure to engage in any form of analysis weighing the competing factors in the ultimate decline of the Nanobeak share value in and of itself warrants a remand. *Rutkoske*, at 180 ("the District Court's basic failure at least to approximate the amount of the loss caused by the fraud without even considering other factors relevant to a decline in [the company] share price requires a remand to determine the amount of the loss, both for purposes of the sentence and restitution.").

And such a remand would not be an academic exercise, for had the District Court undertaken the causation analysis required of it, the Court would have had to have concluded that investor losses were not attributable at all to Mr. Barbera's misrepresentations. The uncontroverted evidence adduced at trial reveals that the investors did not ultimately lose the value of their shares as a direct result of risks concealed by Mr. Barbera's fraudulent inducements, but by virtue of other substantial intervening causes.

The evidence adduced at trial and introduced at sentencing demonstrated that even upon Mr. Barbera's demotion from the role of CEO and his later departure from the Company, Nanobeak still considered itself poised for success.

A press release issued by the Company in April 2020 (introduced at sentencing) continued to herald a device that "[w]hen completed . . . will allow medical professionals to rapidly screen for stage one cancer using only a patient's breath and provide law enforcement the ability to determine in real time the presence of legal and illegal drugs." A935. On the stand, Mr. Joyce testified that after he took over the Company, "[w]e raised the money. Again, I can't remember the exact amount. It was less than a million. We raised the amount of money we thought sufficient to run a proof of concept trial." A386. Despite these rosy prospects, however, "we ran into something I think we're all in this room pretty familiar. *We ran into Covid*. And all the engineering firms that were going to work with us just ceased out, so we spent months, literally months trying to get somebody's attention who would work through Covid to do the proof of concept. And we just eventually ran out of money. I knew I could no longer raise any more money, and I was clearly not a scientist. We needed a new leader." A386 (emphasis added).

Thus, the testimony presented in the Government's case-in-chief by one of its principal witnesses conclusively established that the proximate intervening cause of the ultimate decline in value of the Nanobeak shares was the COVID-19 pandemic, not the materialization of any condition that Barbera concealed from the investors by the statements he made to them to induce them to invest. Within the framework of the proximate cause analysis required for calculation of Guidelines

40

loss, Mr. Joyce's testimony compels the conclusion that no loss enhancement was justified here.

Equally telling for the loss analysis was the record of a Board meeting held on December 10, 2019, that was introduced by the defense in the sentencing phase of the case. A1166-72. At this Board meeting, which took place after Mr. Barbera's unauthorized use of corporate funds was discovered, the Board resolved to retroactively approve a salary for Mr. Barbera of $300,000 per year in recognition of his prior seven years of unpaid service to the Company (resulting in a total compensation of $2.1 million), which substantially wiped the slate clean on any consideration of embezzlement or mishandling of funds, a core predicate of the Government's theory of fraud and investor loss. The District Court made no mention of this critical evidence in its sentencing ruling.[3]

And, to the extent that the District Court may have concluded that Mr. Barbera's embezzlement of corporate assets justified its loss calculation, that consideration has now been conclusively rejected by this Court in its recent

---

[3] The Board also concluded on December 10, 2019 that the "fair market value" of the shares was $0.33 per share (A1169) – the same or higher than the price paid by the investors who testified at trial. *See, e.g.*, A1050 ($0.33); A1071 ($0.25); A1080 ($0.33); A1051,1058 ($0.33). Following the basic loss calculus identified by Judge Winter in *Ebbers*, this evidence alone was sufficient to demonstrate that the Y-day value of the shares (*i.e.*, the day the fraud was revealed) equaled or exceeded the X-day value (*i.e.*, the share price on the date of the fraudulent statement), thereby rendering the loss zero. *Ebbers*, at 127.

decision in *SEC v. Govil*, 86 F.4th 89. There this Court expressly held that that the misappropriation of corporate assets does not in and of itself constitute the pecuniary harm to investors contemplated under the securities fraud provisions of Section 10(b) and Rule 10b-5. In *Govil* the SEC brought a civil enforcement action against the principal of a company for misleading investors about the use of corporate assets. Although investors were told that their investment funds would be used for "various corporate purposes," the controlling shareholder, Aron Govil, who also served as Chief Financial Officer and Chairman of the Board, knowingly diverted corporate funds for his own personal benefit. The Court rejected the District Court's conclusion that such conduct, in and of itself, economically harmed the shareholders. As the Court reasoned, "[t]he district court may have presumed that the investors suffered economic harm by definition when capital that they invested in the company for corporate purposes was looted by an insider. But whether the investors actually suffered pecuniary harm would depend on the type of securities held, the terms of those securities, and when those securities were sold." *Id*. at 104 n.16. By the same token, the District Court in this case automatically assumed, like the district court in *Govil*, that misrepresentations to investors coupled with corporate embezzlement rendered the investors victims of securities fraud. But as this Court has now made clear, that is not enough.

The District Court justified its loss calculation by relying on two decisions cited by the Government as controlling: *United States v. Hsu*, 669 F.3d 112 (2d Cir. 2012) and *United States v. Stitsky*, 536 Fed. App'x 98 (2d Cir. 2013) (summary order). This reliance was unjustified as both of these cases are distinguishable. The formulation of loss in *Hsu* – "the guidelines provide that when an investor puts money into a fraudster's hands, and ultimately receives nothing in return, his loss is measured by the amount of principal invested" – was expressly limited to Ponzi schemes. *Hsu*, 669 F.3d at 120 (Section titled "Calculating Loss in Ponzi Schemes"). And the facts of that case are markedly different from those found here. In *Hsu*, the defendants induced investments in two entities that simply did not exist. As this Court explained, "there was no such business, as there were no such Companies: Hsu had invented them as the seemingly legitimate front for what turned out to be a multimillion-dollar Ponzi scheme." *Id*. at 114. That was certainly not the case with Nanobeak.

The same distinction applies to the holding in *Stitsky*. There the district court expressly found that the investors were left with "nothing of value when the fraud was uncovered" because the "Units" that they supposedly acquired "conferred no value" in the first place. *Stitsky*, 536 Fed. App'x at 111 (internal quotation marks omitted). Once again, these critical facts distinguish *Stitsky* from the Barbera prosecution. *United States v. Byors*, 586 F.3d 222 (2d Cir. 2009),

43

another case cited by the District Court, is similarly distinguishable as it concerned improperly collateralized loans, not shares in a company.

In the event that this Court or the District Court on remand were to conclude that the ultimate loss to Nanobeak shareholders is not attributable to Mr. Barbera, the enhancement of 2 levels for "10 or more victims" under Section 2B1.1(b)(2)(A)(i) would be equally inapposite. Under the Guidelines, "victim" is defined as "any person who sustained any part of the actual loss determined under sub-section (b)(1)." If, as the analysis above demonstrates, there was no actual loss, there were no "victims" to be counted for purposes of applying the 2-level enhancement. *See Govil*, 86 F.4th at 105.

Without the erroneous 18-level loss enhancement or the 2-level ten-victim enhancement, Mr. Barbera's offense level under the Guidelines would be calculated at only 9 (Base Offense Level of 7 with an additional 2 levels for violation of prior order) which carries an incarceration range of 4 to 10 months. This revised Guidelines calculation (9) is markedly lower than that calculated by the Court (29) rendering the sentence unreasonable and justifying a remand for resentencing. *United States v. Selioutsky*, 409 F.3d 114, 118.

### III. The District Court Erroneously Ordered Restitution.

As with the Guidelines loss calculation, the District Court applied an equally erroneous standard for restitution, warranting reversal of the restitution order

issued in this case. This Court reviews orders of restitution for abuse of discretion. "A district court abuses its discretion when a challenged ruling rests on an error of law, a clearly erroneous finding of fact, or otherwise cannot be located within the range of permissible decisions." *U.S. v. Gushlak*, 728 F.3d 184, 194-95 (2d Cir. 2013) (internal quotation marks and citations omitted).

The governing statute here, the Mandatory Victim Restitution Act, authorizes restitution only to a "victim," which is defined as "a person *directly and proximately harmed* as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. 3663A(a)(2) (emphasis added). As the "purpose of restitution is essentially compensatory," a restitution order "must be tied to the victim's actual, provable, loss." *U.S. v. Zangari*, 677 F.3d 86, 91 (2d Cir. 2012); *United States v. Calderon*, 944 F.3d 72, 94-5 (2d Cir. 2019). Restitution, therefore, may only be awarded "in *the amount* of losses directly and proximately caused by the defendant's conduct." *U.S. v. Gushlak*, 728 F.3d 184, 194-95.

Under settled Second Circuit law, the MVRA's proximate cause requirement is a stricter standard than "but-for" causation, and is "akin to the well-established requirement that there be 'loss causation' in securities-fraud cases." *U.S. v. Calderon*, 944 F.3d 72, 95, *quoting United States v. Archer*, 671 F.3d 149, 171 n.16 (2d Cir. 2011) (*citing Lentell*, 396 F.3d 161, 172); *Gushlak*, 728 F.3d 184,

196, 196 n.9 (applying "general principles" from civil securities law, including analysis in *Dura Pharmaceuticals Inc.*, 544 U.S. 336). As in the sentencing loss context, therefore, a district court must look to the proof standards adopted in the civil securities regime for purposes of evaluating and calculating restitution in investor fraud cases. *United States v. Reifler*, 446 F.3d 65, 137 (2d Cir. 2006).

As detailed in Section II above, Mr. Barbera's demotion in late 2019 and the lapse of over two-years until the Company's bankruptcy filing represents a significant break in the chain of causation that the Government and the District Court entirely failed to bridge. And the Government made no showing at sentencing or in connection with restitution -- as it must -- that the types of misrepresentations that Mr. Barbera made to his investors concealed the risk that ultimately led to the failure of Nanobeak as a going concern.

As the Government stated in its Sentencing Letter, "the evidence presented at trial and developed during the Government's investigation demonstrates that investors would not have invested in Nanobeak had they known that investment fund would be used in substantial part to pay for the defendant's personal expenditures." *United States v. Barbera*, 21 Cr. 154 (JGK), ECF 174, at 8. But the Government did not argue -- and there is nothing in the record to establish -- that the Company ultimately failed *as a direct proximate result* of the fact that Mr. Barbera used certain investors funds to compensate himself while he was not

drawing a salary.  Indeed, to the contrary, the Board's resolution to retroactively grant Mr. Barbera a salary for the prior seven years of service (amounting to a grant of $2.1 million in compensation) effectively eliminates this issue for purposes of calculating investor harm under the proximate cause standard.

Other misrepresentations established at trial or in the FBI affidavits submitted at sentencing have an even more attenuated connection to the ultimate failure of the Company.  Misstatements as to (a) Barbera's background and credentials; (b) progress and scope of the testing and product launch; and (c) timing of an IPO bear no demonstrated relationship to the failure of Nanobeak's successor CEO to make the Company a success.

The Second Circuit decision in *United States v. Goodrich*, relied on by the Court in dismissing Mr. Barbera's argument on restitution, does not change the analysis.  In that case, which concerned investments in a "sham company," there was no question that the defendant was a member of the conspiracy (indeed he pled guilty to the charge) nor any dispute as to the *amount* of the loss.  The sole focus of the proximate cause analysis in that case was whether the defendant could reasonably be held responsible for aspects of the conspiracy in which he had no role.  12 F.4th 219, 228 (2d Cir. 2021) (restitution analysis includes losses "flowing from the reasonably foreseeable actions of that defendant's co-conspirators.") (internal quotation marks omitted).  That decision, therefore, did

not purport to alter the basic rule articulated in the leading case on proximate cause in investor-loss cases, *Lentell v. Merrill Lynch & Co.*, that the calculation of loss itself requires "both that the loss be foreseeable *and* that the loss be caused by the materialization of the concealed risk." 396 F.3d at 173; *Gushlak*, 728 F.3d at 197 (proximate cause analysis in restitution context requires exclusion of factors representing "materialization of some non-fraud risk against which investors are not protected by the securities laws"). The same is true of the *United States v. Marino* decision, cited by the District Court, which also concerned a plea of guilty to "a classic Ponzi scheme." *United States v. Marino*, 654 F.3d 310, 311 (2d Cir. 2011). There again, the analysis was not about the scope of the loss (already determined to be $60 million), but merely the defendant's share of responsibility for it. *Id*. at 322.

The District Court's further attempt to justify its ruling by referencing the general principle that there could be more than one proximate cause, and its conclusion that the defendant's misrepresentations concerning "the value of the company and its technology . . . were never cured," SPA , is insufficient to relieve it of its statutory burden to calculate proximate cause according to the principles laid out by this Circuit.

In adopting on a simple "but-for" reliance standard – effectively equating victim loss with the total amount invested -- instead of the more nuanced

proximate cause analysis required by statute, the District Court erroneously granted restitution in this case.

### IV. The Conscious Avoidance Charge was Improper.

The Government's prosecution was founded on the claim that Mr. Barbera was the architect of a scheme to mislead investors for his personal benefit. As the prosecutor stated in summation: "Jeremy Barbera committed a calculated, brazen fraud for years." A772-73. In light of this clearly articulated theory of fraud as conceived and executed by Mr. Barbera himself, the Government overstepped its bounds by seeking a conscious avoidance charge. Over the defense's objection, A764-65, the Court instructed the jury on conscious avoidance with respect to all counts charged. A912-14. This was reversible error.

Under Second Circuit law the conscious avoidance instruction may be given only where two conditions are satisfied: (i) "when a defendant asserts the lack of some specific aspect of knowledge required for conviction"; and (ii) "the appropriate factual predicate for the charge exists." *United States v. Aina-Marshall*, 336 F.3d 167, 170 (2d Cir. 2003) (internal quotation marks and citations omitted). Neither prong of the test was satisfied here. This Court reviews claims of error in jury instructions *de novo*. *Id*.

*First*, Mr. Barbera's defense was not predicated on an argument that he was ignorant of key facts that might have contradicted the information he was

communicating to investors. Instead Mr. Barbera's defense focused on intent: "[a] lot of this case for you is going to be deciding whether Jeremy – what Jeremy's intent was, whether he acted in good faith. Did Jeremy believe that the technology was real. Did he believe that it would work." A189. In ruling on the jury instruction at trial and then in the context of the Rule 33 Motion, the District Court did not even consider this prong of the test, and in the absence of any asserted defense of ignorance there was simply no legal predicate for instructing the jury on conscious avoidance.

*Second*, no facts were elicited at trial from which a rational juror could conclude beyond a reasonable doubt that Mr. Barbera consciously avoided learning key facts that rendered the representations false. In its post-trial ruling, the District Court justified the charge by pointing to the fact that Mr. Barbera "received updates about various projects that should have put him on notice that some of representations to investors were not true." SPA 19. The first example the Court considered was that in spite of receiving disappointing results from the Johns Hopkins clinical trial, the defendant "continued to misrepresent the nature and success of the Johns Hopkins trial." SPA 19. The second was that Mr. Barbera continued to tout a JP Morgan-led IPO to investors despite the fact, as explained by a JP Morgan representative at trial, that the bank had no involvement in a Nanobeak IPO. SPA 20. Even accepting the Court's characterization of the

50

evidence – which was not fully supported by the record [4] -- these examples do not show that Mr. Barbera made representations to investors in deliberate *ignorance* of key facts, but only with deliberate *disregard* of facts *already known* to him. As this Court has instructed, the consideration for conscious avoidance is evidence showing that the defendant "*decided* not to learn a key fact . . . ." *United States v. Rodriguez*, 983 F.2d 455, 458 (2d Cir. 1993). Where the record evidence points instead to "*actual* knowledge," there can be no factual predicate for conscious avoidance. *United States v. Kaplan*, 490 F.3d 110, 128 (2d Cir. 2007). Here there was no evidence in the record that Mr. Barbera intentionally *avoided* learning key details critical to the Company's operations. To the contrary, as the Court's examples show, Mr. Barbera was fully apprised of the relevant facts. That he may have chosen to present those facts in a different way to investors is not conscious avoidance.

---

[4] The District Court's example was premised on Mr. Peters' testimony that Mr. Barbera learned in *February* 2019 that the Johns Hopkins results were "disappointing." This testimony, however, was directly undermined by Defense Exhibit 705 (A1106-07), an email from a professor at Johns Hopkins, Ciprian Crainiceanu, who reported on *April* 2, 2019 that the "preliminary results" of the clinical study were "encouraging" and "a little better than we expected" and "pointing in the direction of confirming some, but not all, of the published findings in the literature." By the same token, the evidence of JP Morgan's involvement in an IPO did not line up with the Court's characterization of it. The statement regarding an IPO with JP Morgan was made not to a prospective investor, but to an existing shareholder, and not to induce him to invest further, but rather to consider becoming an advisor to an offshoot company that would focus on developing animal breath analytics for veterinary purposes. A241-51.

Nor is this an instance where the evidence of actual knowledge of the alleged fraud was so "overwhelming" that instructing the jury on conscious avoidance was harmless error. *See Aina-Marshall*, 336 F.3d at 171. The fraudulent representations at issue in the case concerned (i) the progress and scope of the research and product launch; (ii) the timing of an IPO; and (iii) intended use of corporate funds.[5] For the jury to find the requisite state of knowledge of falsity it had to undertake a careful and nuanced comparison of the alleged misrepresentations with the underlying facts. To complicate matters, some of the representations to investors were couched as forward-looking statements that were not susceptible to ready verification but instead required the jury to evaluate whether Mr. Barbera had information sufficient to justify such predictions. And the Government's evidence on these points was far from compelling or clear cut. This was not a drug or stolen property prosecution where the contraband itself – and thus knowledge of its existence – constitutes proof of the crime. *See*, *e.g.*, *United States v. Adeniji*, 31 F.3d 58 (2d Cir. 1994) (heroin possession); *Aina-Marshall*, 336 F.3d 167 (heroin possession); *Rodriguez*, 983 F.2d 455 (cocaine possession); *United States v. Fofanah*, 765 F.3d 141 (2d Cir. 2014) (transportation of stolen cars).

---

[5] The prosecution also pointed to misrepresentations regarding Mr. Barbera's education and credentials, but as these concern facts uniquely within the scope of Mr. Barbera's knowledge they have no relevance to this analysis.

On the central issue of intended use of Company monies, for example, the jury was presented with conflicting considerations. According to the Government, Mr. Barbera lied when he told investors in the Stock Purchase Agreements ("SPAs") that investor funds would "be used to further advance the business and the technology of the Company as well as for other general corporate purposes." *See, e.g.* A1054. The Government argued the case as if the second clause -- "other general corporate purposes" -- did not exist, *see, e.g.*, A849 860, and elicited testimony from investors that in their view any money received by Mr. Barbera from the investment funds was a violation of the representation in the SPA. *See, e.g.*, A724.1, 728.1. As Thomas Rueger, the Government's witness from JP Morgan Securities, explained, however, funding for startups typically encompasses "clinical trials, research and development, *operating expenses, i.e. paying employees*." A297 (emphasis added). And as Nanobeak Board member Joseph Peters testified, financials prepared by the Company included a line item for officer and director compensation. A600-01, A974. On cross, Mr. Peters admitted that Mr. Barbera was extremely hard working and committed to the Company and therefore entitled to compensation for his efforts "as long as it was done properly." A704. Whether Mr. Barbera's compensation was "done properly" was an issue of internal corporate governance, not a consideration that rendered the representation regarding "general corporate purposes" more or less false.

With respect to claims about the progress of the product development, the evidence was also equivocal. Government witness Richard Fried, for example, testified that in making his investment decision in 2016 he relied, among other things, on an understanding that the device was already functional and could detect lung cancer. A204, 249-50. But in a letter to Mr. Fried, Mr. Barbera stated that the "Johns Hopkins efforts *that are underway*." A1010 (emphasis added). And a slide deck provided by Mr. Barbera to Mr. Fried equally made clear that development of the biomarkers was still a work in progress: the presentation characterized lung cancer detection as "Initiative 1," A1007, and the last entry on a Timeline described how Nanobeak was in partnership with Johns Hopkins University as of 2016 "*to develop* proprietary biomarkers for Cancer & Infectious Disease Detection." A1009 (emphasis added). Mr. Fried acknowledged the room for interpretation inherent in the communications he received, A261-62 ("the tense is confusing"), volunteered that he was making certain assumptions, A251, and later conceded that he had told the investigating FBI agent that he understood that research and development was ongoing "because they were in clinical trials." A268. These "assumptions" were further undermined by Company updates issued years later which continued to make investors aware that the biomarker research was still in the discovery stage: "[t]he Nanobeak clinical trial for stage one lung cancer at Johns Hopkins has reached 333 participants. The trial size is 450

54

participants and the biostatistics team *are in the process of developing* the lung cancer biomarker signature." A1041 (emphasis added); *see also* A670 (Peters: "people would call wanting to know the results of the John's Hopkins clinical trials, and I would say that I didn't know because it was an independent clinical trial and we would have to wait for the results.").

With respect to the prediction about the timing of an IPO, the Government's principal argument was that for an IPO to succeed, Mr. Barbera himself would have had to be the CEO of any future public company (a role he could not assume by virtue of an existing SEC bar). A789 ("defendant didn't want investors to know about the bar because then they would know there could never be an IPO"). But this argument was unsubstantiated. In at least one of the Company documents provided to investors in June 2019, it was newly elected Board Chairman Thomas Joyce who was described as the one "expected to lead the planned IPO next year." A1039. And as Mr. Joyce and Mr. Peters both testified, the Company had enormous if not greater potential without Mr. Barbera at the helm. A372-73, A603-04.

These examples reveal how difficult it should have been for the jury to find that Mr. Barbera acted with knowledge of the falsity of his representations. In the context of representations that were largely subject to interpretation, the conscious avoidance charge had the harmful effect of improperly shaping the jury's

deliberations. *See United States v. Ferrarini*, 219 F.3d 145, 157 (2d Cir. 2000) (acknowledging risk of reversible error where evidence is "equivocal").

## V. The Substance of the Conscious Avoidance Charge Was Legally Incorrect.

The terms of the conscious avoidance charge were also improper in two respects. As Mr. Barbera did not object at trial to the content of the charge, these errors must be reviewed under a plain error standard. *United States v. Balde*, 943 F.3d 73, 97 (2d Cir. 2019). But as the errors here were clear, undoubtedly caused confusion, and seriously affected the outcome of the trial, a remand for a new trial is necessary. *Id.*

The District Court instructed the jury as follows: "An argument by the government of conscious avoidance *is not a substitute* for proof of knowledge; it is simply *another factor* that you the jury may consider in deciding what the defendant knew." A912-13 (emphasis added).

By stating that conscious avoidance was "not a substitute" but merely "another factor" to consider in assessing knowledge, the Court gave the jury an improper understanding of how it was to apply the standard in its deliberations. Actual knowledge and conscious avoidance are arguments in the alternative. *United States v. Kaplan*, 490 F.3d 110, 128 n.7 (2d Cir. 2007). Indeed, in arguing for a conscious avoidance instruction, the Government made clear to the Court that there was "a sufficient factual predicate to argue conscious avoidance *as an*

56

*alternative theory* of knowledge." A764 (emphasis added). And an earlier iteration of the charge introduced the concept of conscious avoidance with the word "alternatively." A760. But the Court did not adopt such wording. Instead, the Court introduced language stating that conscious avoidance is "not a substitute" but just "another factor." In doing so, the Court signaled that the conscious avoidance analysis was simply an element to consider in assessing knowledge generally, not a separate and distinct *alternative* to a finding of direct knowledge. This language was plainly erroneous.

The text of the charge was also erroneous insofar as it did not make clear that conscious avoidance had no application to the element of intent in the fraud charges. The Court properly explained that conscious avoidance has no application to the participation prong of the conspiracy test: "[C]onscious avoidance cannot be used as a substitute for finding that the defense intentionally joined the conspiracy in the first place. It is logically impossible for the defendant to intend to agree to join a conspiracy if he does not actually know it exists." A913. But when applying the same principle to the substantive charges, the Court erred by stating that the "finding of conscious avoidance cannot *alone* provide the basis for finding that the defendant acted with the required intent to commit the crime charged." A914 (emphasis added). The introduction of the word "alone" improperly opened the door to application of the conscious avoidance analysis to

57

the intent prongs of the substantive counts, allowing the jury to erroneously conclude, once again, that it was merely a factor to be considered in the general mix of considerations for that element. But just as in the conspiracy context, consideration of conscious avoidance in analyzing intent for the wire and securities fraud counts was "logically impossible." The conscious avoidance inference does "no more than establish [a defendant's] knowledge of the criminal endeavor, not his specific intent to participate in the crimes charged." *United States v. Samaria*, 239 F.3d 228, 239-40 (2d Cir. 2001), *rev'd on other grounds by United States v. Huezo*, 546 F.3d 174, 180 n.2 (2d Cir. 2008). The jury was not clearly apprised of this critical exception, and this too was plain error.

## VI. The Government Intentionally Withheld *Giglio* Material.

The prosecution violated its constitutional obligations by intentionally hiding from the District Court and defense counsel both at the Suppression Hearing and at trial that there was a material discrepancy between the testimony of the two agents involved in taking the post-arrest statements which were admitted at trial. Under the landmark case of *Brady v. Maryland*, 373 U.S. 83 (1963), "the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment." *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001). "Favorable evidence includes not only evidence that tends to exculpate the accused, but also evidence that is useful

to impeach the credibility of a government witness." *Id*. at 139 (citing *Giglio v. United States*, 405 U.S. 150 (1972)). The test of a *Brady/Giglio* violation is whether the defendant would be deprived of a fair trial. To demonstrate such a deprivation, a defendant must show that "(1) the Government either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice." *Coppa*, 267 F.3d at 140.

At the Suppression Hearing the Government called only one witness, representing to the Court and defense counsel that testimony by the other FBI agent would be "duplicative." A44. This representation, however, was false, as the testimony of the two agents was not consistent on a key aspect of the arrest. The Government's critical omission of this discrepancy unjustly paved the way for admission of the post-arrest statements which undoubtedly had a compelling impact on the jury's deliberations.

Agent Polonitza testified at the Suppression Hearing that after Mr. Barbera's arrest at his apartment he was placed in an FBI transport car and read his *Miranda* rights. As Agent Polonitza testified, after the rights were read, it was Mr. Barbera who initiated conversation about his conduct:

> A. On the way to the hospital, which was a relatively short ride, Mr. Barbera brought up his matter. He started doing most of the talking. He brought up his company, his role, different situations, and individuals involved, and then there came a time, during Mr.

Barbera's statements, that I did ask follow-up questions, but it was Mr. Barbera doing most of the talking during that short ride from his residence to the hospital.

Q.  So to be clear, who started the conversation about the substance of the defendant's conduct?

A. Mr. Barbera

A68.

The District Court made its initial ruling on the basis of this single account of the arrest.  Among other things, the Court fully credited the Agent's testimony that it was the Agent's intent not to question the defendant until they arrived at the FBI Office, and that it was Mr. Barbera who "initiated conversation."  A143. Unbeknownst to the Court and the defense, however, Agent Allain's testimony directly contradicted Agent Polonitza's on the key issue of whether Mr. Barbera had made his statements spontaneously or with substantial prompting by the Agent.

When Agent Allain was called as a witness at trial, the prosecutor (who was not the same AUSA who had handled the Suppression Hearing) elicited the following testimony:

A.  Agent Polonitza began the interview by essentially telling Mr. Barbera what he had uncovered throughout the course of his investigation.

Q.  What were some of those things Agent Polonitza said to Mr. Barbera?

> A. Agent Polonitza told to Mr. Barbera that he uncovered misrepresentations that were stated to the investors, generally about a proposed IPO of Nanobeak with JP Morgan Chase, details about the misuse of investor funds for personal purposes.

A735. At this point, defense counsel objected, and a sidebar was called. The District Court immediately recognized that Agent Allain's account was "not quite the same as what Agent Polonitza said with respect to what the course of the conversation was in the car." A737. Instead of pursuing this discrepancy and re-opening the Suppression Hearing, however, the District Court simply decided to strike the inconsistent testimony and proceed with introducing the evidence of the post-arrest statements.

When the prosecutor presented Agent Allain's testimony at trial, she clearly knew in advance what the Agent would say; there was no mistake or inadvertence. A737. And Agent Allain herself conceded on cross-examination that she was aware since the Suppression Hearing that Agent Polonitza's testimony -- which she observed firsthand in real time -- was inconsistent with her own. A752 ("I remember hearing that, yes"). The Government thus violated its responsibility under *Giglio* to inform the defense of this critical impeachment material.

The Government's misconduct deprived Mr. Barbera and the trial judge of the opportunity to make a fair and complete appraisal of the conditions of his arrest, *see* Section VII below, thereby ensuring that highly prejudicial and damning evidence was introduced at trial. The prosecutors made ample use of the evidence,

61

leveraging it in each address they made to the jury. A178, 782, 799, 860. Given the significant role the post-arrest statements therefore played in the trial, confidence in the verdict is plainly undermined by this misconduct. *Coppa*, 267 F.3d at 135; *see United States v. Taylor*, 745 F.3d 15, 27 (2d Cir. 2014) (finding error not harmless where confession was "critical part of the prosecution's case" and in light of the fact that a "confession is recognized to have a greater impact than the same testimony given by another witness").

## VII. The District Court Abused its Discretion in Failing to Reopen the Suppression Hearing.

The Government's intentional misrepresentation to the District Court that Agent Allain's testimony was merely "duplicative" placed the District Court in a difficult position in the middle of trial when it became clear that her testimony was materially inconsistent with that of Agent Polonitza. But the District Court compounded the prosecutors' error by not re-opening the Suppression Hearing, either at the trial, or after the trial in the context of Mr. Barbera's timely Rule 33 motion. As a result, the District Court determined the admissibility of the post-arrest statements without sufficient information to make an informed decision. The appellate court reviews a trial court's decision whether to grant or deny a motion for reconsideration of a suppression order for abuse of discretion. *United States v. Bayless*, 201 F.3d 116, 131 (2d Cir. 2000). "A district court has abused its discretion if it has (1) based its ruling on an erroneous view of the law, (2) made

a clearly erroneous assessment of the evidence, or (3) rendered a decision that cannot be located within the range of permissible decisions." *United States v. Rios*, 500 Fed. App'x 27, 28 (2d Cir. 2012) (internal quotation marks and citation omitted).

In its Rule 33 decision, the District Court fully acknowledged that there was an inconsistency in the two accounts of the arrest, but concluded in the end that the open question of who started the interview was ultimately irrelevant to the determination of admissibility. SPA10. This was error, for the divergence in the accounts of the two FBI agents went to the heart of the considerations necessary to evaluate the voluntariness of Mr. Barbera's post-arrest statements.

The Government bears the burden of establishing not only that the suspect knowingly waived his *Miranda* rights, but also that the confession is "truly the product of free choice." *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991); *Taylor*, 745 F.3d 15, 23. "A confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time that it is given." *Anderson*, 929 F.2d 96, 99. "Whether a confession is a product of coercion may only be determined after a careful evaluation of the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials." *Id.*

At trial Agent Allain started testifying to an entirely different (and potentially coercive) dynamic in the transport vehicle than what Agent Polonitza originally presented to the Court at the earlier Suppression Hearing. But Agent Allain's truncated account of the conversation was not sufficient for the Court to properly evaluate the totality of circumstances that led to Mr. Barbera's post-arrest statement. If fully developed and credited, this alternative account -- which was consistent with Mr. Barbera's own Declaration (A38-39) -- may very well have changed the entire analysis of the conditions of the arrest, particularly if Agent Polonitza's statements to Mr. Barbera included words that were "false, misleading or intended to trick and cajole the defendant into confessing." *Anderson*, 929 F.2d at 99-101. But the record is devoid of the details as to which Agent Allain was prepared to testify.

Thus the District Court committed legal error insofar as it did not create a full record of those "surrounding circumstances" including the "conditions of interrogation" such that it could undertake the "careful evaluation" required to assess voluntariness and to weigh the relative credibility of the two government agents. *Id*. at 99. Without a complete and balanced presentation of the all the statements made to Mr. Barbera by the FBI in the transport vehicle, the Government did not carry its burden, and the Court was not in a position to make a proper evaluation of voluntariness.

In addition to the key discrepancy between the two agents' testimony, the credibility of Agent Polonitza's testimony was already put in question by implausible conclusions directly bearing on the determination of voluntariness. For one, the Agent claimed that when he read Mr. Barbera his *Miranda* rights, he could tell that "he understood the rights." A102. According to the Agent, "I remember looking at Mr. Barbera. You could tell, it appeared anyway, that he was thinking of things." A102. And then, "I remember just looking at his expressions." A102. This testimony is simply not credible in light of the fact that: (i) the arrest took place in December when it was "dark on the drive at 6:30 in the morning," according to Agent Allain, A734, 755 ("The back of the car was rather dark. I don't think that a video of the interview would have shown a clear picture . . . ."); and moreover, (ii) by Agent Polonitza's own admission, Mr. Barbera was wearing a mask when he was placed in the transport vehicle. A99. These starkly implausible claims establish compelling reasons to conclude that Agent Polonitza's testimony was lacking in credibility. In relying on such testimony as the basis for its ruling, A147 ("Special Agent Polonitza looked at the defendant while reading the warnings to make sure the defendant was paying attention and engaged"), the District Court made a clearly erroneous assessment of the evidence.

Separate and apart from the conduct of the Agents, the circumstances of the arrest were highly unusual and unprecedented given that Barbera was suffering

from COVID-19 *and* pneumonia at the time of arrest. Mr. Barbera's Declaration asserted that he did not even recall being read his *Miranda* rights and that he "found it difficult to focus." A38-39. The testifying agent was quick to admit at the hearing that the FBI had never before dealt with a defendant who was actually sick with COVID-19, A81, and acknowledged the extraordinary uniqueness of the situation. A121 ("the argument that we're facing here that someone didn't understand those rights due to COVID has never come up before. . . ."), A122 ("these are unforeseen situations that I haven't dealt with before").

Mr. Barbera's debilitated physical state from a double infection created a unique and unprecedented circumstance heightening the concern that Mr. Barbera was not in a frame of mind to properly exercise a waiver of his rights and that the Agents could therefore have overborne his will. As this Court has recognized, "continued questioning of a sleep-deprived suspect can be coercive, depending on the circumstances" even in the absence of abusive conduct. *Taylor*, 745 F.3d at 25.

For all these reasons, the District Court should have taken steps to develop a full record before making a final assessment of the voluntariness of Mr. Barbera's post-arrest statements. As noted in Section VI above, the introduction of the post-arrest statements was not harmless error in light of the Government's substantial reliance on Mr. Barbera's words to prove its case and the great evidentiary weight such evidence carries.

### VIII. The Government Introduced Insufficient Evidence of a Conspiratorial Agreement.

The Government presented insufficient evidence to support a conviction for conspiracy under 18 U.S.C. § 371, as charged in Count One. Although this argument was not raised in post-trial motions, this Court may still entertain review for plain error. *United States v. Sangmin Chun*, 399 Fed App'x 669 (2d Cir. 2010). Should this Court conclude that the evidence was insufficient, this count of conviction must be vacated. *United States v. Ustica*, 847 F.2d 42, 45-46 (2d Cir. 1988).

"The gist of conspiracy is, of course, agreement." *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1191 (2d Cir. 1989). And to establish agreement, a "meeting of minds" is required. *United States v. Rosenblatt*, 554 F.2d 36, 38 (2d Cir. 1977). Thus, "in order to prove a conspiracy, the government *must show* that two or more persons agreed to participate in a joint venture intended to commit an unlawful act." *United States v. DeSimone*, 119 F.3d 217, 223 (2d Cir. 1997).

The Government's conspiracy charge was based on an allegedly illicit agreement between Carl Smith and Jeremy Barbera. According to the Government, these two individuals were "partner[s] in crime" who worked together to solicit investments in Nanobeak based on false inducements. A782. But Mr. Smith never took the stand, and nor did Mr. Barbera. Thus the only

evidence of any agreement between the two men was an email from Mr. Barbera to Mr. Smith confirming the details of their engagement:  "Nanobeak will send you common stock @ $.25 per share which you will in turn personally sell @ $.33 per share."  A977.  According to the agreement, Smith was to purchase Nanobeak shares on his own account (through his company Phantasmic Entertainment) and then resell them to investors; his commission would be the difference between his purchase price and the sale price, or $0.08 per share.  *See* A611-12.  There was nothing suspicious or secret about this arrangement, and the terms were perfectly legitimate.  Indeed, Board Member Joseph Peters confirmed that he was fully aware of the arrangement.  A611-12.  In spite of the email and this testimony, the Government misrepresented to the jury that the agreement was to "split the profits on Nanobeak shares that Smith sold," A794-95, but this is not what the email reflects, and as made clear below, there was no other evidence to support such a claim.

The trial evidence reflected that Mr. Smith sold 200,000 shares of Company stock (that he had initially purchased on his own account for Phantasmic Entertainment) to 18 different investors.  A980.2.  Of these 18, the Government

called only one to testify: Jaime Pike. But her testimony failed to yield a shred of evidence of any illicit understanding between Mr. Smith and Mr. Barbera.[6]

The evidence showed that Smith was an independent salesman for the Company, not an employee of Nanobeak. No evidence was introduced proving or even tending to suggest that he had direct access to information about the Company and its business operations. His only source of knowledge, therefore, was Jeremy Barbera (or Mr. Peters, with whom he also worked, A570, 573), and all of the information he used to pitch potential investors was based on materials that had been provided to him by the Company. That he forwarded Company press releases to Ms. Pike, and may have parroted some of the misrepresentations in them in his cover letters, does not mean that he did so with knowledge of any falsehoods contained therein. A1037-46.

In analyzing a similar commercial arrangement in *United States v. Pearlstein*, the Third Circuit has held that independent salesmen who simply repeat lies fed to them by company management but who have no knowledge of the truth or falsity of those representations do not thereby become members of the conspiracy. *United States v. Pearlstein*, 576 F.2d 531, 537-46 (3d Cir. 1978) ("that these salesmen performed acts in furtherance of the illicit objectives of the

---

[6] Another investor, Robert Wood, testified to speaking with Mr. Smith on a few occasions, but his interactions were principally with Mr. Barbera, and he did not invest through Phantasmic Entertainment. A718-24.

[conspiracy] does not justify a finding that they thereby joined it, unless their knowledge of its fraudulent purpose also can be demonstrated"). This holding is fully consistent with this Circuit's oft-repeated principle that "a defendant's mere presence at the scene of a criminal act or association with conspirators does not constitute intentional participation in the conspiracy, even if the defendant has knowledge of the conspiracy." *United States v. Samaria*, 239 F.3d 228, 235 (2d Cir. 2001) (collecting cases).

Furthermore, Mr. Smith received his compensation according to a formula, and there was no evidence that he had any side agreement with Barbera to "divide," or "carve up" the proceeds of any of the investments. In this regard, the Government made much of a set of transactions in the Phantasmic bank account in April 2019, which reflected a deposit from Jaime Pike of $8000, and an outgoing transfer of $10,000 to a personal account in the name of Jeremy Barbera. A1093. Addressing this evidence, the Government stated that "in one case the defendant and Smith simply carved up an investor's money for themselves with none of the investor's money making it to Nanobeak, none of it at all, zero money used the way it was promised, all of it just stolen." A177, 803 ("Pike's money was just stolen"). These bold and inflammatory assertions were not supported by the evidence. First, the bank account transaction did not show any money being "carved up" between Mr. Barbera and Mr. Smith. To the contrary, all of Ms.

70

Pike's funds, plus $2000 more, were transferred to Mr. Barbera. Second, the record was clear that Ms. Pike received in return the full complement of shares that she purchased. A411, 1047-49. Indeed a Nanobeak cap table introduced by the Government reflects 38,847 shares in the name of "Pike, Jaime/Nathan," A980, directly contradicting the Government's claim to the jury that the document contained no such reference. A803. There is thus no evidence that money was stolen from Ms. Pike and divided with Mr. Smith, as the prosecutors bluntly claimed.

In the absence of any evidence, direct, circumstantial or otherwise, that Mr. Smith knew that certain of the representations he passed on about the Company were false, knew what Mr. Barbera intended to do with the investor funds, or benefited from any illicit gain, no rational juror could have concluded beyond a reasonable doubt that there was a conspiratorial agreement between Mr. Barbera and Mr. Smith.

## **CONCLUSION**

For the foregoing reasons, Mr. Barbera's conviction on all three counts of the indictment should be overturned, or in the alternative the case be remanded for a new trial and/or resentencing.

Dated: December 19, 2023

Respectfully submitted,

 */s/ Alexander H. Shapiro*
Alexander H. Shapiro
Stephen R. Halpin III
FORD O'BRIEN LANDY LLP
275 Madison Avenue, 24th Floor
New York, NY 10016
Tel.: (212) 858-0040 (main)
Fax: (212) 256-1047
ashapiro@fordobrien.com
shalpin@fordobrien.com

*Counsel for Defendant–Appellant*
*James Jeremy Barbera*

## CERTIFICATE OF COMPLIANCE

Under this Court's Local Rules, an appellant is permitted to file a principal brief of up to 14,000 words.  *See* Loc. R. 32.1(a)(4)(A).  On November 30, 2023, the Court granted Defendant–Appellant's motion for leave to file an oversized principal brief of up to 17,000 words.  [Dkt. 35].  This document complies with the Court's order because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and Fed. R. App. P. 21(d), this document contains 16,834 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in proportionally spaced typeface using Microsoft Word, Version 16.79.1, in 14-point Times New Roman font.

Dated: December 19, 2023        */s/ Alexander H. Shapiro*
                                  Alexander H. Shapiro